IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT COURT OF WEST VIRGINIA
AT MARTINSBURG

JESSICA B. BOWERS,

        Plaintiff,

v.                                           Civil Action No.:  3-23-CV-119

JEFF S. SANDY, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS THE FORMER CABINET
SECRETARY OF THE WEST VIRGINIA DEPARTMENT OF
HOMELAND SECURITY,
BETSY JIVIDEN, INDIVIDUALLY AND AS AN
EMPLOYEE OF THE WEST VIRGINIA DIVISION OF
CORRECTIONS AND REHABILITATION,
DIDYMUS TATE, INDIVIDUALLY, AND AS AN
EMPLOYEE OF THE WEST VIRGINIA DIVISIION OF
CORRECTIONS AND REHABILITATION,
JOHN/JANE DOE, UNKNOWN EMPLOYEES
OR AGENTS OF THE ABOVE ENTITY,
IN THEIR INDIVIDUAL
CAPACITIES, AND AS EMPLOYEES
OR AGENTS OF THE ABOVE ENTITIES,
ASHLEY FISHER, individually and as an employee
of PrimeCare,
LISA BEARD, individually and as an employee
of PrimeCare,
KELSEY SHANK, individually and as an employee
of PrimeCare,
CHRISTIN BELL, individually and as an employee
of PrimeCare,
BRENDA ENGLE, individually and as an employee
of PrimeCare,
CHRISTINA WAY, individually and as an employee
of PrimeCare,
CHELSEA MCCRORK, individually and as an employee
of PrimeCare,
MORTICIA MARSHALL, individually and as an employee
of PrimeCare,
BRANDY SCOTT, individually and as an employee
of PrimeCare,
JEANNETTE SWEITZER, individually and as an employee
of PrimeCare,
ALFRED BALDERA, individually and as an employee
of PrimeCare,

PRIMECARE MEDICAL, INC., AND
PRIMECARE MEDICAL OF WEST VIRGINIA, INC.

    Defendants.

## AMENDED COMPLAINT

  NOW COMES Plaintiff, Jessica B. Bowers (Jessica Bowers), by counsel, Christopher J. Heavens of Heavens Law Firm, PLLC, and Stephen P. New of Stephen New & Associates, and for her Amended Complaint against the above-named Defendants alleges as follows:

## PARTIES

  1. Jessica Bowers was incarcerated at Division of Corrections and Rehabilitation's facility at the Eastern Central Regional Jail ("ERJ") in Martinsburg, Berkeley County, West Virginia, at the time of the events complained of in this Amended Complaint. Jessica Bowers is a resident of Hedgesville, Berkeley County, West Virginia.

  2. Defendant, Jeff S. Sandy (hereinafter "Former Cabinet Secretary Sandy"), was at all times relevant hereto an employee of the West Virginia Department of Homeland Security (hereinafter the "WVDOHS") and was at all times relevant hereto acting within the scope of his employment and under color of law.

  3. WVDOHS Defendant, Former Cabinet Secretary Sandy, was charged with providing support, oversight, and guidance to the West Virginia Division of Corrections and Rehabilitation (hereinafter "WVDOCR").

  4. Cabinet Secretary Sandy, who upon information and belief, resides in Kanawha County, West Virginia, is sued in his individual capacity.

  5. Defendant, Betsy Jividen (hereinafter "Former Commissioner Jividen"), was an employee of the WVDOCR from January 8, 2018 until August 5, 2022, and was at all times

relevant hereto acting within the scope of her employment and under color of law as the Commissioner of the WVDOCR.

6.     The WVDOCR is the administrative division of the West Virginia Department of Homeland Security ("WVDOHS") tasked with administering and exercising direct and effective control over prisons and jails in West Virginia.  Upon information and belief, WVDOCR operates thirty (30) correctional facilities throughout West Virginia, including the ERJ.

7.     As Commissioner of the WVDOCR, Former Commissioner Jividen was vested with executive authority and responsibility for the administration, operation, and control of all WVDOCR facilities and employees of WVDOCR facilities.  Former Commissioner Jividen's duties included establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all individuals in the custody of the WVDOCR. *See* W. Va. Code § 15A-3-4; W. Va. Code § 15A-3-12.

8.     Among other things, Former Commissioner Jividen was charged with ensuring that inmates received appropriate medical care while housed in any West Virginia jail.  Former Commissioner Jividen was similarly charged with maintaining and operating the jail facilities in West Virginia in a manner that meets the minimal civilized measure of life's necessities.

9.     The Commissioner is also tasked with ensuring that inmates housed in WVDOCR facilities are treated for their medical needs, like those of Plaintiff, Jessica Bowers.

10.    Likewise, Commissioners are tasked by law with ensuring that jail facilities in West Virginia, including ERJ, complied with all policy directives and procedures applicable to the correctional system.

11.    Former Commissioner Jividen, who upon information and belief, resides in Ohio County, West Virginia, is sued only in her individual capacity.

12.     Defendant, Didymus Tate (hereinafter "Superintendent Tate"), was at all times relevant hereto an employee of the WVDOCR and was at all times relevant hereto acting within the scope of his employment and under color of law as the administrator of ERJ.

13.     Superintendent Tate is tasked by law with the care and custody of all detainees and prisoners incarcerated at ERJ.  Superintendent Tate is vested with authority and responsibility for the safe staffing, administration, operation, and control of ERJ, including, but not limited to, the oversight of all ERJ employees, and the authority to promulgate, amend, and implement all policies and procedures within ERJ to ensure constitutional confinement and treatment of all individuals incarcerated therein.  *See* W. Va. Code § 15A-3-5.

14.     Among other things, Superintendent Tate is charged with ensuring that inmates are subjected to appropriate and humane conditions of confinement while housed in ERJ. Superintendent Tate is similarly charged with maintaining and operating ERJ in a manner that meets the minimal civilized measure of life's necessities.

15.     Superintendent Tate is also tasked with ensuring that inmates housed in ERJ are reasonably free from illegal drugs and contraband.

16.     Likewise, Superintendent Tate is tasked by law with ensuring that jail facilities in West Virginia, including ERJ, comply with all policy directives and procedures applicable to the correctional system, including all procedures pertaining to appropriate care for the medical and psychological needs of inmates and/or detainees.

17.     Superintendent Tate and all Defendants are sued both in their individual capacities, for wrongfully and negligently failing to meet the standards imposed on them, proximately causing injuries and damages to the Plaintiff as alleged herein.

4

18.     Defendants, John/Jane Doe, are presently unknown employees, representatives, or agents of the Defendant, Division of Corrections and Rehabilitation, whose actions/inactions contributed to and caused the injuries to Jessica Bowers.

19.     Defendant, PrimeCare Medical of West Virginia, Inc., was responsible for providing medical care to inmates in ERJ including Jessica Bowers. PrimeCare Medical of West Virginia, Inc. has filed for bankruptcy protection.

20.     Additionally, PrimeCare Medical of West Virginia, Inc. was at all relevant times an alter ego of PrimeCare Medical, Inc. Upon information and belief:

a.     PrimeCare Medical Inc. comingled funds and other assets with PrimeCare Medical of West Virginia, Inc. including, for example, by purchasing insurance policies and paying insurance premiums on behalf of PrimeCare Medical of West Virginia, Inc.;

b.     PrimeCare Medical Inc. is the sole owner of PrimeCare Medical of West Virginia, Inc.;

c.     PrimeCare Medical of West Virginia, Inc. failed to maintain minutes, records, and other corporate formalities;

d.     PrimeCare Medical Inc. and PrimeCare Medical of West Virginia, Inc. are owned and managed by the same parties;

e.     PrimeCare Medical Inc. failed to adequately capitalize PrimeCare Medical of West Virginia, Inc. for the reasonable risks of its undertakings;

f.     PrimeCare Medical Inc. used PrimeCare Medical of West Virginia, Inc. as a mere shell or conduit to operate some particular aspect of its business;

g.   PrimeCare Medical of West Virginia, Inc. used the same offices, letterhead, policies and protocols, employees, attorneys, human resources department, and other resources as PrimeCare Medical Inc.;

h.   PrimeCare Medical Inc. actively managed the day-to-day operations of PrimeCare Medical of West Virginia, Inc. including, for example, by creating routine employee schedules for employees of PrimeCare Medical of West Virginia, Inc.;

i.   PrimeCare Medical of West Virginia, Inc. does not maintain its own website or other marketing operations and is otherwise represented to be the same enterprise as PrimeCare Medical, Inc.;

j.   PrimeCare Medical Inc. and PrimeCare Medical of West Virginia, Inc. concealed the identity of PrimeCare Medical of West Virginia, Inc.'s ownership, management, and financial interests;

k.   PrimeCare Medical Inc. disregarded legal formalities and failed to maintain a proper arm's length relationship with PrimeCare Medical of West Virginia, Inc.;

l.   PrimeCare Medical Inc. manipulated assists and liabilities to concentrate assets in itself and liabilities in PrimeCare Medical of West Virginia, Inc.;

m.   PrimeCare Medical Inc. used PrimeCare Medical of West Virginia, Inc. to enter into a contract with the State of West Virginia in which agreed, among other things, to provide medical and health services to inmates in ERJ that complied with state law, federal law, and met the National Commission on Correctional Health Care's standards knowing that PrimeCare Medical of West Virginia, Inc. could not meet those standards; and

n.     PrimeCare Medical Inc., therefore, used PrimeCare Medical of West Virginia, Inc. to contract with the State of West Virginia to avoid the risk of nonperformance of that contract.

21.     PrimeCare Medical of West Virginia, Inc. entered into a contract with the State of West Virginia in which agreed, among other things, to purchase and maintain liability insurance policies applicable to its operations in ERJ.  As noted above, however, PrimeCare Medical Inc. purchased insurance on behalf of itself and PrimeCare Medical of West Virginia, Inc., with WVDCR named as an additional insured.

22.     Defendant Ashley Fisher was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment as the HSA at ERJ.

23.     Ashley Fisher, who upon information and belief resides in Jefferson County, West Virginia, is sued only in her individual capacity.

24.     Defendant Lisa Beard was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment at ERJ.

25.     Lisa Beard, who upon information and belief resides in Jefferson County, West Virginia, is sued only in her individual capacity.

26.     Defendant Kelsey Shank was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment as a medical assistant at ERJ.

27.     Kelsey Shank, who upon information and belief resides in Berkeley County, West Virginia, is sued only in her individual capacity.

28.     Defendant Christin Bell was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment as a licensed graduate social worker at ERJ.

29.     Christin Bell, who upon information and belief resides in Berkeley County, West Virginia, is sued only in her individual capacity.

30.     Defendant Brenda Engle was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment as an RN at ERJ.

31.     Brenda Engle, who upon information and belief resides in Jefferson County, West Virginia, is sued only in her individual capacity.

32.     Defendant Christina Way was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment as an LPN at ERJ.

33.     Christina Way, who upon information and belief resides in Berkeley County, West Virginia, is sued only in her individual capacity.

34.     Defendant Chelsea McCrork was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment as a medical assistant at ERJ.

35.     Chelsea McCrork, who upon information and belief resides in Berkeley County, West Virginia, is sued only in her individual capacity.

36.     Defendant Brandy Scott was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment as a medical assistant at ERJ.

37.    Brandy Scott, who upon information and belief resides in Berkeley County, West Virginia, is sued only in her individual capacity.

38.    Defendant Morticia Marshall was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment as an LPN at ERJ.

39.    Morticia Marshall, who upon information and belief resides in Berkeley County, West Virginia, is sued only in her individual capacity.

40.    Defendant Alfred Baldera was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of his employment as a doctor at ERJ.

41.    Alfred Baldera, who upon information and belief resides in Cabell County, West Virginia, is sued only in his individual capacity.

42.    Defendant Jeannette Sweitzer was at all times relevant hereto an employee of PrimeCare and was at all times relevant hereto acting within the scope of her employment as a certified registered nurse practitioner at ERJ.

43.    Jeannete Sweitzer, who upon information and belief resides in Morgan County, West Virginia, is sued only in her individual capacity.

## JURISDICTION AND VENUE

44.    Jessica Bowers re-alleges and incorporates by reference, as if fully set forth herein, all the allegations contained in the above paragraphs of the Amended Complaint.

45.    Pursuant to W. Va. Code § 55-17-3, notice of this action has been properly served upon the chief officer of the government agency defendants and the office of the West Virginia Attorney General.

46.     Venue for this action properly lies in this court because the wrongful acts and/or omissions that form the basis for this action occurred in Berkeley County, West Virginia.

## INTRODUCTION

47.     Jessica Bowers re-alleges and incorporates by reference, as if fully set forth herein, all the allegations contained in the above paragraphs of the Amended Complaint.

48.     Jessica Bowers was detained at ERJ on March 10, 2022, and was found unresponsive in her cell on March 29, 2022, having overdosed on Fentanyl that was brought into the Defendants' facility, in whole or in part, because of the wrongdoing of the Defendants.

49.     Jessica Bowers was taken by ambulance from ERJ to Berkeley Medical Center (BMC) where BMC found Fentanyl in her system. On page 5 of the Berkeley Medical Center record, documentation reveals the diagnosis:

> Poisoning by fentanyl or fentanyl analogs, accident (unintentional) initial encounter (CMS HCC)

SEE: Page 5 of BMC Record, attached as **Exhibit 1.**

50.     Jessica Bowers was not ordered or dispensed Fentanyl as part of her medical care while incarcerated from March 10, 2022 to March 29, 2022, at ERJ.

51.     Jessica Bowers could have only ingested Fentanyl if it was brought into ERJ, either with the criminal participation of John/Jane Doe Defendants or as a result of the deliberate indifference of Defendants.

52.     At the time of her injury on Tuesday, March 29, 2022, Jessica Bowers was being housed in intake for observation at ERJ and was under the care of ERJ and PrimeCare Medical, Inc., and/or PrimeCare Medical of West Virginia, Inc. hereinafter referred to as ("PrimeCare").

53.     Jessica Bowers was booked into the Eastern Regional Jail at 2317 hours, on March 10, 2022, and on this date and March 11, 2022, there was a medical Screening completed on Jessica Bowers.

54.     On March 18, 2022, Jessica Bowers was transferred from her general cell to intake for observation due to it being reported that she was taking drugs in her cell.

55.     On March 18, 2022, the Defendants knew and/or should have known that illegal drugs had been brought into their facility and there was a high risk of harm to Jessica Bowers because of the use of illegal drugs, and Defendants did nothing to prevent Jessica Bowers from obtaining and ingesting illegal drugs in violation of her right to safety.

56.     At all times relevant herein, the bringing of illegal drugs and contraband into Defendants' facilities was at epidemic levels because of the understaffing of Defendants' facilities, lack of control over the screening of persons entering the Defendants' facilities and because of the active criminal participation of Defendants' own employees, who have been convicted of accepting bribes and bringing drugs and contraband into Defendant's facilities.

57.     The understaffing of Defendants' facilities has created an environment where even minimum standards for correctional facilities cannot be met and, in 2022, the governor of West Virginia declared a state of emergency because the staffing shortages at the Defendant's facilities was creating conditions that violated the constitutional rights of persons incarcerated therein, and created an environment where injury and death to incarcerated persons was increasing because of said understaffing. SEE: Emergency Order, attached as **Exhibit 2.**

58.     The state of emergency declared by the Governor has been widely reported in the news media and West Virginia Division of Corrections and Rehabilitation Acting Commissioner, Brad Douglas, told a legislative committee in 2023, "There are 1,027 vacancies, which is 33%

vacancy rate for officers and a 27% vacancy rate overall. That number, as you can see there on your chart, it's slowly getting worse."

59.     As a result of the Defendants' deliberate indifference, Jessica Bowers was deprived of oxygen for a period of time in her cell after overdosing, resulting in permanent brain damage to Jessica Bowers.

## APPLICABLE LEGAL STANDARDS

60.     Jessica Bowers re-alleges and incorporates by reference, as if fully set forth herein, all the allegations contained in the above paragraphs of the Amended Complaint.

61.     The Division of Corrections and Rehabilitation has a duty to its inmates to provide adequate and appropriate medical care and to ensure that those persons to whom they assign this duty are appropriately providing medical care to incarcerated persons, and they breached this duty to Jessica Bowers.

62.     Defendants in blatant and reckless disregard for its basic obligations to incarcerated persons, inflicted punishment upon Jessica Bowers during the period she was under its custody and control, by callously ignoring her medical needs, ultimately causing her brain damage, all in violation of the 14th Amendment of the United States Constitution.

63.     The actions and/or inactions of all the Defendants and their agents, representatives and employees in assessing and treating Jessica Bowers and failing to provide her a medical unit or hospital where she could have received appropriate treatment, was deliberately indifferent and caused damages to the person of Jessica Bowers. Because of the deliberate indifference of Defendants, Jessica Bowers has suffered, and continues to suffer permanent damages.

64.     The Defendants failed to prevent the actions/inactions of their employees, representatives and agents resulting in deliberately indifferent conduct occurring that affected

Jessica Bowers, placement within the jail and treatment and provision for safety during her incarceration, including permitting illegal drugs to be brought to Jessica Bowers who they knew was a drug addict when Jessica Bowers entered Defendants' facility.

65.     All Defendants, as detailed throughout this Amended Complaint and in the above and below factual descriptions and causes of actions, either directly caused damages and brain damage to Jessica Bowers through their negligent, deliberately indifferent and/or reckless actions/inactions, failed to adequately take steps to care for Jessica Bowers or are liable for the same reasons stated throughout this Amended Complaint.

66.     Pursuant to *Hafer v. Melo*, 502 U.S. 21, 31 (1991), Defendants, Jividen, Sandy, Tate and John/Jane Does are state officials being sued in their individual capacities as persons within the meaning of 42 U.S.C.A. §1983.

67.     As is detailed herein below, Defendants, Jividen, Sandy, Tate and John/Jane Does are not entitled to qualified immunity under §1983 because (1) they violated a federal or constitutional right of Jessica Bowers and (2) the unlawfulness of their conduct as it pertained to Jessica Bowers was clearly established at the time of her injuries. *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

68.     As is detailed herein, under the Fourteenth Amendment to the U.S. Constitution, there is clear evidence that there was deliberate indifference to the serious medical needs of Jessica Bowers by Defendants, Jividen, Sandy, Tate and John/Jane Does.

69.     At all times relevant herein, Jessica Bowers was a detainee and under the Fourteenth Amendment Due Process Clause, she was entitled to protection against "cruel and unusual punishment." The Fourth Circuit Court of Appeals has held the rights of detainees under the Fourteenth Amendment are even greater than the rights of convicted prisoners under the Eighth

Amendment when it comes to protection from "cruel and unusual punishment." *Cooper v. Dyke*, 814 F.2d 941, 948-49 (4th Cir. 1987). Under *Cooper v. Dyke* it was impermissible for Defendants Jividen, Sandy, Tate and John/Jane Does to subject Jessica Bowers to any form of punishment at all, let alone "cruel and unusual" punishment, which, as is detailed herein, is what occurred in this instance.

70.     The particular conditions and restrictions of Jessica Bowers' detention, as detailed herein, against Defendants, Jividen, Sandy, Tate and John/Jane Does, were either (1) imposed with an expressed intent to punish her or (2) not reasonably related to a legitimate nonpunitive government objective, in which case a jury may infer an intent to punish. *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988).

71.     As is detailed herein below, Jessica Bowers clearly establishes a due process violation for deliberate indifference to the serious medical needs of Jessica Bowers as it is legally inferred that the Defendants, Jividen, Sandy, Tate and John/Jane Does, failed to respond to Jessica Bowers' known medical needs. *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990).

72.     Defendants violated WVDCR policy directives, including but not limited to, Policy Directive 308.00 Contraband Control and Preservation of Evidence.

73.     Defendants violated WVDCR Policy Directive 308.00 Contraband Control & Preservation of Physical Evidence by failing to ensure appropriate security practices, including designation of secure areas, evidencing an ongoing system designed to detect contraband, preventing its introduction and removing it when found.

## PRIMECARE LIABILTY

74.     Jessica Bowers re-alleges and incorporates by reference, as if fully set forth herein, all the allegations contained in the above paragraphs of the Amended Complaint.

75.     Jessica Bowers had been incarcerated at Defendant's facilities on five separate occasions prior to her March 10, 2022, admission. All these admissions pertained to imminent concerns of withdrawal and addiction. Upon admission, Jessica Bowers was found to have multiple substances in her system which varied from admission-to-admission and included fentanyl, buprenorphine, marijuana, benzodiazepines, alcohol and MDMA.

76.     When Defendants completed the booking process for Jessica Bowers, they recognized she had a long history of substance use disorder and consequently had numerous incarcerations related directly or indirectly to substance. Upon her admissions to ERJ, because of concerns of imminent withdrawal, as per the National Commission on Correctional Health Care and the State of West Virginia, Jessica Bowers was referred to the care of PrimeCare, the vendor of medical and psychiatric services at the Eastern Regional Jail for screening regarding substance use.

77.     Defendant, PrimeCare, supplied medical services to Jessica Bowers on five separate occasions prior to the March 10, 2022, admission. All these admissions pertained to imminent concerns of withdrawal and addiction. Upon admission, Jessica Bowers was found to have multiple substances in her system which varied from admission-to-admission and included fentanyl, buprenorphine, marijuana, benzodiazepines, alcohol and MDMA.

78.     PrimeCare employee, Ms. Chelsea McCrork, made the following entry, found on page 239 of the PrimeCare PDF (PCPDF) in the early hours of March 11, 2022, finding previous heroin use by Jessica Bowers 12 hours before:

| 03-11-2022 12:11 am | Pt denies SI/HI. Pt states she has a rod in her femur and had an infection, Pt on doxycycline starting 09/2021 x6 months according to outside records on file from BMC. Pt states she fills at Walgreens and this is the last month on antibiotics. Pt states she was using "boot" prior to intake and that she has been up for 2 days. Pt states she used about a gram 12hrs ago. Pt having a panic attack on intake which she has hx of anxiety and panic attacks in the past. Pts vitals all stable with an elevated pulse. Pt unable to sit still during assessment, nurse notified and tasked to recheck in 1 hr. Sandwhich and water given to help calm patient. PPD not placed due to pts movements tasked for when she is able to hold still. FS completed, Covid screen neg and forms all signed. No lice/scabies noted. Pt presents with discoloration of both wrists stating it is from the cuffs during arrest. |

<u>SEE</u>: Page 239 of PrimeCare Record, attached as **Exhibit 3.**

79.     PrimeCare Nurse McCrork further noted on Page 125 PCPDF:

| Problems recorded during prior incarcerations: | Opiate Withdrawal Z13.9 Encounter for screening, unspecified INTEGUMENTARY Heroin Withdrawal Benzo Withdrawal S72.92 Unspecified fracture of left femur T84.7 Infection and inflammatory reaction due to other internal orthopedic prosthetic devices, implants and grafts |
|---|---|

<u>SEE</u>: Page 125 of PrimeCare Record, attached as **Exhibit 4.**

80.     The PrimeCare Medical staff was fully aware at the time of Jessica Bowers' admission to ERJ on March 10, 2022, that she had been using heroin and other substances for years, indicative of recalcitrant substance use, yet the PrimeCare record incorrectly states:

| When was the last time you used Heroin / Methadone? | Never |
|---|---|

<u>SEE</u>: Page 127 PCPDF – PrimeCare PDF, attached as **Exhibit 5**.

81.     None of the PrimeCare records show that Jessica Bowers had been prescribed methadone.

82.     Jessica Bowers indicated she is not on a MAT (medication assisted treatment) with an agent such as methadone or buprenorphine. <u>SEE</u>: Page 128 of the PrimeCare PCPDF, attached as **Exhibit 6.**

83.     Jessica Bowers had a urine drug screen (UDS) on March 12, 2022, the time of specimen collection was not recorded; the results were placed into the record at 8:42 PM and were **positive for Fentanyl**. <u>SEE</u>: Page 135 of the PrimeCare PCPDF, attached as **Exhibit 7.**

84.     On Page 135 of the PCPDF, LPN Christina Way recorded a telephone, verbal order from medical (Thaker) on March 13, 2022, at 11:52 AM to begin a t3 taper, a Tylenol with codeine taper as per protocol:

| Telephone / Verbal Order Form (Medical) | Orders Received | t3 taper | Way, LPN, Christina | 03-13-2022 11:52 am |
|---|---|---|---|---|
| Telephone / Verbal Order Form (Medical) | Length of order | per protocol | Way, LPN, Christina | 03-13-2022 11:52 am |

85.     Page 173 of the PCPDF: The Tylenol with codeine began on March 13, 2022, at 1:05 PM with 60 mg three times per day. Tapering started on March 15, 2022, and was completed March 20, 2022, with the last Tylenol with codeine at sleep time, 8:16 PM.

| 03-13-2022 1:05 pm | Received | [blank] | Haley, Courtney | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 2 Tab By Mouth TID |
|---|---|---|---|---|
| 03-13-2022 10:06 pm | Received | [blank] | Scanlan, Jacqueline | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 2 Tab By Mouth TID |
| 03-14-2022 7:10 am | Received | [blank] | Engle, Brenda | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 2 Tab By Mouth TID |
| 03-14-2022 1:24 pm | Received | [blank] | Scott, Brandy | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 2 Tab By Mouth TID |
| 03-14-2022 10:21 pm | Received | [blank] | Miller, LPN, megan | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 2 Tab By Mouth TID |
| 03-15-2022 8:35 am | Received | [blank] | Way, LPN, Christina | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 2 Tab By Mouth BID |
| 03-15-2022 9:49 pm | Received | [blank] | Bickford, Kelly | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 2 Tab By Mouth BID |
| 03-16-2022 10:16 am | Received | [blank] | Levy, Kimberly | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 2 Tab By Mouth BID |
| 03-16-2022 10:07 pm | Received | [blank] | Moon, LPN, Tara | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 2 Tab By Mouth BID |
| 03-17-2022 11:42 am | Received | [blank] | Way, LPN, Christina | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 1 Tab By Mouth BID |
| 03-17-2022 6:40 pm | Received | [blank] | Moon, LPN, Tara | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 1 Tab By Mouth BID |
| 03-18-2022 9:15 pm | Received | [blank] | Scanlan, Jacqueline | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 1 Tab By Mouth BID |
| 03-19-2022 10:03 pm | Received | [blank] | Moon, LPN, Tara | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 1 Tab By Mouth QHS |
| 03-20-2022 8:16 pm | Received | [blank] | Miller, LPN, megan | Acetaminophen/Codeine #3 (Tylenol #3) 300/30mg 1 Tab By Mouth QHS |

86.     A scheduled follow-up with a provider was not planned despite implementation of an opioid detoxification protocol; follow-ups were left to being PRN (as needed.)

| Telephone / Verbal Order Form (Medical) | Follow up | | prn | Way, LPN, Christina | 03-13-2022 11:52 am |
|---|---|---|---|---|---|

87.     The next set of notes appear on March 15, 2022, starting at 7:35 PM. There is no indication why there had been no interval notes and why they seemed to delay starting assessments for opioid withdrawal 2.5 days after they had orders since assessing for withdrawal a critical element in their written detoxification protocol:

| 3648752e | COWS / CIWA (Ar) / CIWA (B) | COWS Score: In addition enter the COWS score in the comment of the vital sign section | 5 | Bickford, Kelly | 03-15-2022 7:35 pm |
|---|---|---|---|---|---|
| 3648752e | COWS / CIWA (Ar) / CIWA (B) | COWS Withdrawal Scale: | 5-12 Mild | Bickford, Kelly | 03-15-2022 7:35 pm |

88.     On Page 136 of the PCPDF, Ms. Bickford concluded Jessica Bowers was going through mild opiate withdrawal. Please see the appendix of this report for the COWS questionnaire and how it is graded for withdrawal.

89.     On Page 137 of the PCPDF, LPN Tara Moon on March 16, 2022, at 10:45 PM noted the COWS scale now a one and thus no clinical evidence of an opiate withdrawal:

| 3648752e | COWS / CIWA (Ar) / CIWA (B) | COWS Score: In addition enter the COWS score in the comment of the vital sign section | 1 | Moon, LPN, Tara | 03-16-2022 10:45 pm |
|---|---|---|---|---|---|

90.     On Page 183 of the PCPDF on March 17, 2022, there is an indication she had an active infection in her right arm and a request made for a medical evaluation. A medical provider wanted to see her that day; no COWS entries made for March 17, 2022:

| | |
|---|---|
| **Appointment Scheduled Date** | 03-17-2020 |
| **Appointment Created Date** | 03-17-2020 2:43 am |
| **Appointment Description** | Boil under right arm; requesting to be seen by provider- per provider, she wants to see this Pt today. |
| **Appointment Category** | NP/PA |
| **Priority (1=High, 5=Low)** | 1 |

91.     From Page 183 of the PCPDF: Nurse practitioner Jones evaluated Jessica Bowers on March 17, 2022, at an unknown time. There are no medical notes available for this encounter, so it is unclear where the boil was located, its cause and how it was treated.

92.     The next note chronologically is on Page 239 of the PCPDF written by LPN Christina Way on March 18, 2022, at 5:32 PM:

| | |
|---|---|
| 03-18-2022 5:32 pm | pt has exhibited unusual behaviors the last 2 days. Yesterday this nurse believed pt was having difficulty with detox process and discussed this with provider who allowed 1x dose of Zofran 4 mg im. Pt was not cooperative, twisting and turning, she stated she wanted it but then stated she was afraid of needles. She laid on bunk and held this nurse's leg and was able to tolerate injection. Pt reported that it did help. Today pt's behavior was not improved. She did not appear dehydrated either day but stated that she had vomited on both days. Today this nurse felt another intervention may be needed until girls in the same section reported that pt had been taking drugs in the section. Security was notified that pt needed to be moved to intake for better observation of her behaviors. |

93.     LPN Christina Way reported difficulty with the detoxification process and was concerned that illicit drugs taken by Jessica Bowers. She decided it was critical for medical reasons to have Jessica Bowers transferred to a unit where there was better observation.

94.     A physician or advanced practice clinician did not evaluate Jessica Bowers notwithstanding these documented concerns and the known active infection in her right arm and the historical left hip abscess.

95.     No documented determination made by Ms. Way or other PrimeCare staff on March 18, 2022, if Jessica Bowers was having severe withdrawal requiring transfer to a hospital for aggressive lifesaving treatment. No COWS scores were documented in the record.

96.    On Page 239 of the PCPDF, over the next three days on March 19, March 20, and Match 21, 2022, Jessica Bowers appeared to be stable. Corresponding medical records as to her medical status have not been provided.

| 03-19-2022 7:00 am | Housed in intake for observation No complaints thru the night Rested on cot ,cooperative | Engle, Brenda | Medical Staff | Medical Note |
|---|---|---|---|---|
| 03-20-2022 5:04 am | Housed in in take for observation and detoxing Has rested on cot thru the night with no complaints voiced Pending chow this am | Engle, Brenda | Medical Staff | Medical Note |
| 03-21-2022 2:28 am | Housed in the Intake for Observation. Rested on bunk during the night. No s/s of distress/depression. No complaints voiced, no SI/HI voiced or reported. Will continue to monitor. | Marshall, Mortricia | Medical Staff | Misc. Note |

97.    From Page 239 of the PCPDF: On March 22, 2022, at 3:31 AM, Brandy Scott made observations without conclusions:

| 03-22-2022 3:31 am | Pt housed in intake for observation. Pt laying on bunk face down with her feet on the wall. There is trash all over the cell floor and what appears to be ripped up styrofoam plates and cups on her bunk and cell floor. Will cont. to monitor. |
|---|---|

98.    From Page 239 of the PCPDF: Similarly, Mortricia Marshall made observations and recorded them on March 23, 2022, and March 24, 2022:

| 03-23-2022 7:33 am | Housed in Intake for observation. Rested on bunk most of the night. Ate breakfast. Trash continues to be all over floor. No s/s of distress/depression. No complaints voiced, no SI/HI voiced or reported. Will continue to monitor. | Marshall, Mortricia | Medical Staff | Misc. Note |
|---|---|---|---|---|
| 03-24-2022 | Housed in Intake for observation. Rested on bunk most of night. No s/s of distress/depression. No complaints voiced, no SI/HI voiced or reported. Will continue to monitor. | Marshall, Mortricia | Medical Staff | Misc. Note |

99.    On Page 255 of the PCPDF, mental health provider Christin Bell identified that Jessica Bowers had no orientation and psychomotor agitation:

| Call Date | 03-24-2022 12:37 pm |
|---|---|
| Clinician Name | Christin Bell |
| Requested by Patient? | Yes |
| Subjective | 03-24-2022 12:37 pm - Bell, Christin : MH attempted to interview Pt in intake around 1058, at request of custody. Pt provides intermittent engagement in interview. When asked if she had Hx of MH Tx Pt replies, "I really have." Pt stares blankly at this MH provider when assessing for suicidality. MH provider offered to return at late time to interview Pt replies, "you promise." |
| Objective | 03-24-2022 12:37 pm - Bell, Christin : Pt is alert and appears to have no orientation. Pt presents with psychomotor agitation. |
| Assessment | 03-24-2022 12:37 pm - Bell, Christin : defer at this time |
| Plan | 03-24-2022 12:37 pm - Bell, Christin : MH will attempt to reinterview Pt at another time |

100.    However, despite no orientation and psychomotor agitation, there are no notes found after Ms. Bell's assessment on March 24, 2022, and there are no entries in the PrimeCare PDF for March 25, 2022.

101.    From Page 240 of the PCPDF: The next notation in the record is by Brenda Engle and is from March 26, 2022, at 6:53 AM:

| 03-26-2022 6:53 am | Housed in intake for observation Quiet on her cot all night Offered no complaints this am Pending chow |
|---|---|

102.    From Page 240 of the PCPDF: Although the next entry by Kelsy Shank is time stamped for March 27, 2022, the note indicates it was a late entry for the previous day, March 26, 2022:

| 03-27-2022 6:26 am | Late entry for 3/26/22 @ 2100- Pt has been laying on floor face down without any pants on. Encouraged multiple times to get up and get dressed. Cell with empty trays throughout. This writer and Lt Jordan into cell to clean up trash and food scattered throughout. Assist pt up. Pt assisted up by this writer and Lt Jordan to bunk. Pt reports bad leg pain to bil legs. One time dose of Tylenol given and Gatorade provided. VS WNL. Pt assisted to laying position and covered up with blankets, pt visible goosebumps to bil arms reports cold. Educated not to lay on the ground voiced understood. Laid down and rested w/ eyes closed. |
|---|---|

103.    Despite the unusual behaviors, the known boil (abscess), and the history of MRSA infections, an advanced practice medical professional (APRN or MD) was neither alerted nor summoned by Kelsy Shank or other PrimeCare employees.

104.    Authored by Brenda Engle is the next chronological entry on March 27, 2022, at 6:44 AM on Page 240 of the PCPDF:

| 03-27-2022 6:44 am | Housed in intake for observation with detoxing This am after medication for pain states she feels better but she is standing at the door picking her milk carton apart and does other bizarre behavior like that. She ate her morning chow. Has moderate tremors of upper extremities She can converse but she struggles to create a lucid conversation Will continue to monitor |
|---|---|

105.    Although clearly still following a detoxification protocol there are no COWS entries. Jessica Bowers is also noted to have tremors and an **abrupt change in mental status**. Despite the change in mental status an advanced practice medical professional (APRN or MD) was not summoned. Having an abrupt change in mental status is a medical urgency and with medical certainty requires an evaluation by a licensed provider promptly.

106.    At this juncture, a change in mental status could be from a wide variety of medical, metabolic, and neurological conditions, many of which can be life threatening. However, special consideration given the clinical circumstances necessary regarding opioids, opioid withdrawal, other drugs, and sepsis.

107.    From Page 240 of the PCPDF: The next chronological entry is about 24 hours later. Lisa Beard recorded further bizarre behaviors:

| 03-28-2022 7:10 am | Housed in intake for observation. Pt has been up most of the night sitting or laying on bunk, randomly screaming out. Pt chews on Styrofoam trays and milk cartons. Encouraged not to do this by staff. Pt cont to scream out during breakfast. Eats with her hands. No complaints voiced. Multiple attempts to get pt up from bunk to lay on her mat w/ no success. Will cont to monitor. |
|---|---|

108.    Despite the documented unusual behaviors an advanced practice medical professional (APRN or MD) was not summoned to see Jessica Bowers urgently, but an

22

appointment was scheduled for the next day despite PrimeCare employee, Ashley Fisher, recognizing the clinical situation as a high priority.

109.   On Page 229 of the PCPDF an entry was made at 11:30 AM on March 28, 2022, for a doctor's appointment the next day, on March 29, 2022, for "abnormal behaviors" and a possible drug induced psychosis:

| Appointment Scheduled Date | 03-29-2022 |
| --- | --- |
| Appointment Created Date | 03-28-2022 11:30 am |
| Appointment Description | Please see patient for possible drug induced psychosis. |
| Appointment Category | Doctor |
| Priority (1=High, 5=Low) | 1 |

110.   Despite the unusual behaviors and change in mental status another ~18 hours pass until the next entry into the record. There is no indication that any advanced medical services provided to help determine why Jessica Bowers was having her abrupt change in mental status at that time.

111.   Authored by Morticia Marshall, the next chronological entry was on March 29, 2022, at 5:08 AM on Page 240 of the PCPDF:

| 03-29-2022 5:08 am | Call from Intake to access Pt. Spo2 94% HR apical 86 Radial 76 BP 148/88 RR 20 Prior to going to Intake Officer stated that her chin was placed on the bunk and her body was on the floor and face purple. Pt not responding to verbal commands. Ammonia caps place in nose and it did not bother her. Call placed to the on call MD DR. Baldera and he said send to the ER for evaluation. |
| --- | --- |

112.   Given the purple face, with a reasonable degree of medical certainty Jessica Bowers had been hypoxic and hypo-ventilating before discovery by staff. Although calling 911 for

23

emergency transport correctly, if oxygen available, Dr. Baldera should have ordered it along with continuous pulse oximetry.

113.    Emergency services notified of the 911 call on March 29, 2022, at 5:23 AM. EMS arrived at the WV Eastern Regional Jail at 5:40 AM and were with Jessica Bowers by 5:42 AM.

114.    At the WV Eastern Regional Jail, EMS staff interviewed the jail and PrimeCare staff and began providing services as detailed in the EMS narrative. In addition to recording information told to them by the staff, they made their own observations (See A in EMS narrative) of Jessica Bowers' face initially being purple with circumoral cyanosis, supporting that Jessica Bowers had a hypoxic event for an unknown amount of time and still was hypoxic when they arrived.

**Narrative:** Dispatched, responded ALS for a sick person. CHART:

(C) ALOC, Possible Anoxic Injury

(H) Arrived on scene to find the patient seated in cell of ERJ, awake but not responsive to voice. Staff advise that the patient was found face down with her neck underneath the bench in a contorted position, states that her face was purple and she was gasping for breath. Staff advise the patient was moved to a supine position and her neck was placed back into anatomical position, states the patient woke up and sat up but has not been acting appropriately since that time. Staff advise the patient is 10 days into her stay @ the ERJ, states that she has had little to eat or drink and was complaining of abdominal pain yesterday. Info packet from jail advises the patient has a history of benzo and opiate withdrawal.

(A) Obtunded female seated supine in cell w/ a blank stare. Face was initially purple w/ circumoral cyanosis. Neck tenderness is noted w/ palpation. Skin pale, dry. Mucous membranes appear dry, cracked. Pupils E&R @ 3mm. Normal work of breathing, lungs were diminished. No JVD, no edema.

(R) Manual cervical spine immobilization was performed prior to the application of a collar, PMSx4 intact before & after. Cardiac monitor was applied which shows Sinus Tachycardia. 12 lead to show the same w/o ST segment changes. IV access was difficulty given the ERJ's handcuffs and shackles which they state cannot be moved or touched, #20g IV was started in the LH.

(T) Patient was monitored enroute to the hospital, no change in mental status was noted. 250mL of NS was administered throughout care. Report to RN @ bedside. Patient is unable to sign, transfer of care. Crew clear.

| 03-29-2022 6:14 am | Pt transported via EMS. Report given to Rebecca, RN at BMC-ER. |
|---|---|

115.    The EMS run sheet shows they left the WV Eastern Regional Jail at 6:00 AM (although the PrimeCare entry from Page 240 of the PCPDF says 6:14 AM) and arrived at the hospital at 6:07 AM.

116.    Jessica Bowers was transferred to Berkely Medical Center (BMC); 2543 pages of medical records cover her admission from March 29, 2022, until discharge to home with a family member on May 15, 2022.

117.    On page 30 of the BMC records, an admitting history written by Dr. David Deuell summarizes Jessica Bowers' condition on arrival:

**Chief Complaint:** Altered Mental Status

**HISTORY OF PRESENT ILLNESS**

Jessica Bleu Bowers, date of birth 6/21/1991, is a 30 y.o.female who presents to the Emergency Department with altered mental status. Patient arrives in the department via EMS from ERJ. EMS states patient was found purple and unresponsive at ERJ on a bench. Upon arrival at ERJ, EMS placed patient on non-rebreathe mask. Patient's heart rate was in the 150's and decreased to 103's after oxygen. Patient does not answer questions or follow commands.  EMS states patient was on opioids/benzos prior to incarceration. Patient is slightly more alert upon arrival here.

118.    During the hospital stay, it was determined that Jessica Bowers had severe MRSA sepsis from skin lesions, a pulmonary embolus, hepatitis C, abnormal liver functions and a brain injury pattern described as leukoencephalopathy. She was intubated, placed on a ventilator, and admitted to the hospital ICU. On page 5 of the BMC record, documentation shows in addition to the life- threatening medical conditions noted, while she was a ward of the WV Eastern Regional Jail, she was poisoned from Fentanyl:

119.    On page 27 of the BMC record, there is a summary of Jessica Bowers' hospital course:

Poisoning by fentanyl or fentanyl analogs, accidental (unintentional) initial encounter (CMS HCC)

**REASON FOR HOSPITALIZATION AND HOSPITAL COURSE:** This is a 30 y.o., female admitted with MRSA bacteremia due to IV drug abuse and the possible infective endocarditis,R sided PE,  blood cultures were positive for MRSA.. History of drug abuse , no use of cocaine , benzodiazepines , and opioids in the past who presents with altered mental status from ERJ.

Dr. Connie Smith consulted.  Echo showed EF of 60-65% with no valvular abnormality, brain MRI was negative for any septic emboli.  Multiple excoriation marks are noted on skin which can be the source of MRSA infection.  Completed IV antibiotics course of 2 weeks, last day was April 13th.  Repeat blood culture showed no growth to date.

**Altered mental status due to fentanyl abuse, social withdrawal leukoencephalopathy.**  Her urine drug screen was positive for fentanyl.  Patient lacks capacity.  Healthcare surrogate is her mother.  Her mother will be her primary care giver.

Abnormal LFTs, IV drug abuse increases risk for hepatitis, LFTs are improving.  She is hepatitis-C positive with high viral loads. Need to follow up with ID.

120.    Jessica Bowers was left with marked cognitive and physical incapacity and no longer can care for herself. She has been followed as an outpatient at BMC and by Eastern Panhandle Mental Health Services.

121.    From page 18 of 35 pages from the Panhandle Mental Health Services record from the June 21, 2022, Tele-health visit:

> The patient was recently admitted to The Berkeley Medical Center due to an overdose. She was in jail and she used illicit substances and was taken to the nearest hospital due to altered mental status. Since the overdose the patient has had problems with her memory and her appetite has increased significantly where she had gained a lot of weight.
>
> The patient is diagnosed with Adhd.
>
> The patient is diagnosed with a Substance use disorder (opioids. cannabis).

122.    Jessica Bowers was seen in follow up by WVU Neurology, APRN Theresa Triggs on August 5, 2022 (BMC records page 59):

> **Information obtained from**: patient and mother
> **Chief Complaint:** New Patient (Memory issues )
>
> **HPI:** Jessica Bleu Bowers  is a 31 y.o., White female who presents with h/o overdose of opiate and intubation in ICU and continued memory issues since that time
> She had hip surgery in 2020, is filing for disability, broke femur, hip surgery, is not on any pain medication at this time; she is on topiramate for anxiety, can't sleep well; she is only taking this at night

123.    APRN neurologist Triggs concluded

> 1.    **Opiate dependence, continuous (CMS HCC)**    **F11.20**
> 2.    Memory deficit    R41.3
> 3.    Generalized anxiety disorder    F41.1
> 4.    Toxic metabolic encephalopathy    G92.8
>
> -h/o overdose injury to the brain
> -repeat MRI Brain
> -REALLY work the brain
> -find a daily goal

## PRIMECARE BREACHES OF MEDICAL STANDARDS

124.    Jessica Bowers re-alleges and incorporates by reference, as if fully set forth herein, all the allegations contained in the above paragraphs of the Amended Complaint.

125.    Jessica Bowers was having bizarre and unusual behaviors starting on March 18, 2022. The etiology of the bizarre behaviors was unknown, but there was a concern she may have taken illicit drugs while incarcerated despite supervision.

126.    Jessica Bowers was transferred to a unit where better observation could ensue. However, despite better observation, Jessica Bowers was found hypoxic, cyanotic, and not responsive on March 29, 2022. No one knows how long she was lying there on the floor unresponsive, hypoxic, and cyanotic despite the escalation to a higher level of observation.

127.    The PrimeCare staff documented serially, changes in mental status and bizarre behavior but did not initiate medical investigations to determine why Jessica Bowers was behaving strangely. By March 20, 2022, they had completed the codeine taper, so the bizarre behavior could not be attributed to pre-incarceration heroin.

128.    On March 26, 2022, despite the unusual behaviors, the known boil (skin infection), the goosebumps and feeling cold, an advanced practice medical professional (APRN or MD) was not summoned by Kelsy Shank or other PrimeCare employees.

129.    On March 27, 2022, Jessica Bowers was noted to have tremors and an abrupt change in mental status. Despite the change in mental status an advanced practice medical professional (APRN or MD) was not summoned. Having an abrupt change in mental status was a medical urgency and required an evaluation by a licensed provider promptly.

130.    Jessica Bowers' bizarre behaviors continued on March 28, 2022. Despite the documented unusual behaviors an advanced practice medical professional (APRN or MD) was not

summoned. Notwithstanding the unusual behaviors and change in mental status, about another 24 hours pass until the next entry into the record.

131.    The next entry on March 29, 2022, Jessica Bowers was found on the floor with her chin on the bunk. It's not clear how long she had been there, but it had been long enough for her to have become cyanotic. So, despite the alleged increased observation, the staff missed Jessica Bowers' physical and respiratory collapse; did not notice she was lying on the floor.

132.    Given the purple face, with a reasonable degree of medical certainty Jessica Bowers had been hypoxic and hypo-ventilating before discovery by the staff.

133.    Although calling 911 for emergency care and transport to a hospital correctly, at a minimum, Dr. Baldera should have ordered oxygen along with continuous pulse oximetry to be started immediately upon discovery of Jessica Bowers' hypoxia.

134.    The PrimeCare staff not starting oxygen immediately upon discovery that Jessica Bowers needed oxygen, was a deviation from acceptable medical practice, since not providing oxygen delayed receipt of oxygen at least another nineteen minutes; nineteen more minutes with a brain not getting adequate oxygen.

135.    To a reasonable degree of medical certainty, it was a deviation from acceptable medical practice for the PrimeCare team to not aggressively assess Jessica Bowers' abrupt change in mental status on March 27, 2022. SEE: Certificate of Merit, attached as **Exhibit 8.**

136.    To a reasonable degree of medical certainty, PrimeCare's delay in getting Jessica Bowers evaluated for her change in mental status delayed diagnosis of septicemia, pulmonary embolism, hypoxia, and illicit use of Fentanyl*, all of which contributed to the respiratory collapse requiring EMS services on March 29, 2022. SEE: **Exhibit 8.**

137.    Fentanyl consumed by Jessica Bowers prior to incarceration, would no longer be found in her plasma or urine. Thus, the Fentanyl found in urine at BMC was consumed, with a

28

reasonable degree of medical certainty, no more than 3 to 4 days prior to admission to BMC, between March 25, 2022 to March 29, 2022, and with a reasonable degree of medical certainty, responsible for the fentanyl poisoning diagnosed at BMC. <u>SEE</u>: **Exhibit 8.**

138.    If Jessica Bowers was evaluated on March 27, 2022, for her deteriorating mental status, she would have received medical care for her progressing septicemia, pulmonary embolism, hypoxia, and illicit use of Fentanyl if it was in her system at that time, which with a reasonable degree of medical certainty, would have averted the crisis of March 29, 2022, at the WV Eastern Regional Jail necessitating EMS services. <u>SEE</u>: **Exhibit 8**.

139.    If Jessica Bowers was evaluated on March 27, 2022, for her deteriorating mental status and received medical care for her progressing septicemia, pulmonary embolism, hypoxia, and illicit use of Fentanyl, with a reasonable degree of medical certainty, she would <u>not</u> have had the hypoxic insult to her brain on March 29, 2022, and would not be afflicted with permanent neurocognitive deficits. <u>SEE</u>: **Exhibit 8**.

140.    The PrimeCare staff not starting oxygen immediately upon discovery that Jessica Bowers needed oxygen on March 29, 2022, was a deviation from acceptable medical practice, which with a reasonable degree of medical certainty, contributed adversely to a hypoxic brain injury and long- term neurocognitive dysfunction. <u>SEE</u>: **Exhibit 8.**

141.    To a reasonable degree of medical certainty, Fentanyl was brought into the jail despite the supervision and protection of the staff of the WV Eastern Regional Jail and PrimeCare and was used by Jessica Bowers between March 25, 2022 to March 29, 2022. <u>SEE</u>: **Exhibit 8**.

142.    To a reasonable degree of medical certainty, based on the medical record evidence, Jessica Bowers suffered an opioid overdose and poisoning at the WV Eastern Regional Jail from Fentanyl as documented in the BMC records between March 25, 2022, to March 29, 2022. <u>SEE</u>: **Exhibit 8**.

143.     To a reasonable degree of medical certainty, as a complication of the Fentanyl overdose and poisoning, in combination with septicemia and pulmonary embolism, Jessica Bowers suffered a hypoxic injury to her brain with a long-term neurocognitive injury. SEE: **Exhibit 8**.

144.     To a reasonable degree of medical certainty, some of Jessica Bowers' neurocognitive injuries are permanent and life altering. SEE: **Exhibit 8**, **Exhibit 9**,  **Exhibit 10** and **Exhibit 11**.

145.     To a reasonable degree of medical certainty, if it were not for the deviations from acceptable medical care by the PrimeCare staff and the neglect of the WV Eastern Regional Jail staff allowing illicit fentanyl to be available, Jessica Bowers would have averted respiratory failure and hypoxia on March 29, 2022, at the WV Eastern Regional Jail necessitating EMS services. SEE: **Exhibit 8**, **Exhibit 9**, **Exhibit 10** and **Exhibit 11**.

## NEGLIGENCE AND VIOLATIONS OF CONSTITUTIONAL RIGHTS

146.     Jessica Bowers re-alleges and incorporates by reference, as if fully set forth herein, all the allegations contained in the above paragraphs of the Amended Complaint.

147.     The actions and/or inactions of the Defendants as described herein above constitute negligence and/or violations of Jessica Bowers's Constitutional rights and subjects them to liability to Jessica Bowers under West Virginia and Federal Law, as stated herein above. Specifically, PrimeCare has violated medical standards as set forth in the reports of Dr. Lloyd Saberski (**Exhibit 8, Exhibit 9, Exhibit 10, Exhibit 11**) and Defendants, Jividen, Sandy, Tate and John/Jane Does, violated Jessica Bowers' constitutional rights through their unlawful and deliberately indifferent conduct as set forth herein above.

## NEGLIGENT HIRING, RETENTION AND SUPERVISION

148.   Jessica Bowers re-alleges and incorporates by reference, as if fully set forth herein, all the allegations contained in the above paragraphs of the Amended Complaint.

149.   Defendant, PrimeCare, was negligent in the hiring and/or retention of its employees who failed to provide medical care to Jessica Bowers at the standard of care. PrimeCare failed to properly supervise its employees to ensure that the wrongful conduct described herein above would not occur.

150.   PrimeCare is vicariously for all negligence, medical professional negligence, tortious conduct, and actions/inactions of its employees that contributed to or proximately caused the injuries and death of Jessica Bowers and damages to Jessica Bowers.

151.   PrimeCare's actions were willful, wanton and/or undertaken with reckless disregard and/or reckless indifference to the rights of Jessica Bowers, entitling Jessica Bowers to punitive damages in an amount to be determined by the jury.

152.   Such conduct by Defendants also entitles Jessica Bowers to be awarded her attorneys' fees and costs.

### FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983
### (Conditions of Confinement)

153.   Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

154.   Defendants, while acting under color of law and within the scope of their employment, violated the Fourteenth Amendment right of pretrial detainees to be free of punishment without due process.

155.   The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to the Plaintiff, under the Fourteenth Amendment to the United States Constitution by

depriving them of basic human necessities including safety, constituting punishment without due process.

156.    Defendants imposed and/or permitted these conditions despite said conditions not being reasonably related to any legitimate non-punitive governmental or penological objective.

157.    Defendants were deliberately indifferent to the health, safety, and other basic needs of the Plaintiff, as described hereinabove, by having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner.

158.    Defendant supervisors likewise exhibited supervisory indifference or tacit authorization of the misconduct of subordinates and the constitutional injuries committed by said subordinates.

159.    Defendant supervisors had actual or constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury and the Defendant supervisors' response to said knowledge was so inadequate as to show deliberate indifference or tacit authorization of these constitutional injuries.

160.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived the Plaintiff of her Fourteenth Amendment rights by and through its official policies or customs, *inter alia*, PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

161.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

162.    During the time period at issue, it was clearly established that the serious deprivations of basic human needs at ERJ, including safety, as described hereinabove, violated the Fourteenth Amendment to the United States Constitution.

163.    The actions of Defendants, described hereinabove, deliberately injured the Plaintiff in a way unjustified by any governmental interest.

164.    The actions of Defendants, described hereinabove, shock the conscious.

165.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

166.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, the Plaintiff suffered a deprivation of her Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of neurocognitive damages; the development of associated medical conditions; and consuming illegal drugs that were smuggled into the jail where she was housed.

167.    In addition to these compensatory damages, the Plaintiff will also seek to recover, under 42 U.S.C. § 1988, attorneys' fees and cost incurred during the course of this litigation.

168.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to the Plaintiff, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

## FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983
### (Deliberate Indifference To Serious Medical Needs)

169.    The Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

170.    The conduct of Defendants, Jividen, Sandy, Tate and John/Jane Does, in permitting persons to bring Fentanyl into the ERJ and failing to protect Plaintiff, is a violation of standards applicable to correctional facilities and was a proximate cause and/or contributing factor to the injuries suffered by Jessica Bowers, because Plaintiff, Jessica Bowers, was a drug addict who did not receive help to withdraw from her drug dependency in a manner that complied with the basic standards applicable to all defendants.

33

171.   This conduct by Defendants, Jividen, Sandy, Tate and John/Jane Does, showed deliberate indifference to the medical needs of Jessica Bowers and the unlawfulness of this conduct by Defendants was sufficiently clear so that every reasonable public official in their position would understand that what they were doing was unlawful.

172.   Defendants, while acting under color of law and within the scope of their employment, violated the Fourteenth Amendment right of pretrial detainees to be free of punishment without due process.

173.   The actions of Defendants, described hereinabove, violated the constitutional rights guaranteed to the Plaintiff, under the Fourteenth Amendment to the United States Constitution by acting with deliberate indifference to the serious medical needs of inmates.

174.   As described hereinabove, Defendants routinely failed to promptly provide necessary and reasonable medical treatment to the Plaintiff.

175.   Defendants were deliberately indifferent to, and willfully ignored, the serious medical needs of the Plaintiff, as described hereinabove, by failing to establish, monitor, and/or enforce policy directives and operational procedures to ensure that inmates at ERJ receive prompt and reasonable treatment for their medical needs.

176.   Defendant supervisors likewise exhibited supervisory indifference or tacit authorization of the misconduct of subordinates and the constitutional injuries committed by said subordinates.

177.   Defendant supervisors had actual or constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury and the Defendant supervisors' response to said knowledge was so inadequate as to show deliberate indifference or tacit authorization of these constitutional injuries.

34

178.    PrimeCare, through the John/Jane Doe PrimeCare Employees, deprived the Plaintiff of her Fourteenth Amendment rights by and through its official policies or customs, *inter alia*, PrimeCare policies and procedures, PrimeCare Acceptance of Terms & Conditions, and the National Commission on Correctional Healthcare's Jail and Prison Standards.

179.    The actions of Defendants, described hereinabove, were not taken in good-faith, were objectively unreasonable, and were in violation of clearly established law.

180.    During the time period at issue, it was clearly established that failing to promptly provide necessary and reasonable medical treatment to inmates at ERJ, as described hereinabove, violated the Fourteenth Amendment to the United States Constitution.

181.    The actions of Defendants, described hereinabove, deliberately injured the Plaintiff in a way unjustified by any governmental interest.

182.    The actions of Defendants, described hereinabove, shock the conscious.

183.    The actions of Defendants, described hereinabove, were unlawful and unjustified.

184.    As a direct and proximate result of Defendants' unlawful, unjustified, and unconstitutional actions, the Plaintiff suffered a deprivation of their Constitutional rights and physical harm, and will seek compensatory and nominal damages for, *inter alia*, physical pain and discomfort; the physical effects of her neurocognitive damages; the development of associated medical conditions; and consuming illegal drugs that were smuggled into the jail where she was housed.

185.    In addition to these compensatory damages, the Plaintiff will also seek to recover, under 42 U.S.C. § 1988, attorneys' fees and cost incurred during the course of this litigation.

186.    The actions of Defendants were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to the Plaintiff, thereby justifying an award of punitive damages, to the extent such damages are recoverable under the applicable insurance policy(s).

187.     The actions of Defendants, Jividen, Sandy, Tate and John/Jane Does, violated the constitutional rights guaranteed to Jessica Bowers under the Fourteenth Amendment to the U.S. Constitution and the West Virginia Constitution.

188.     With respect to Defendants, Jividen, Sandy, Tate and John/Jane Does, Jessica Bowers specifically only seeks recovery up to the limits of the applicable insurance policies.

### WAIVER OF GOVERNMENTAL IMMUNITY AND PUNITIVE DAMAGES

189.     Jessica Bowers re-alleges and incorporates by reference, as if fully set forth herein, all the allegations contained in the above paragraphs of the Amended Complaint.

190.     The conduct of Defendants and John/Jane Doe Defendants, described herein above, including their flagrant disregard of Jessica Bowers' medical needs and safety, was willful, wanton, reckless, fraudulent, oppressive, and outrageous under any definition of those terms.

191.     Under common law, the case of *Parkulo v. West Virginia Board of Probation and Parole and the West Virginia Division of Corrections*, 199 W.Va. 161, 483 S.E.2d 507 (1997), Syllabus Point 8, there is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive. In this matter, the Defendants and John/Jane Doe Defendants' conduct has been fraudulent, malicious and/or oppressive.

192.     As to Defendants and John/Jane Doe Defendants, there is no immunity, cap on damages, or other tort damage limitation applicable to Jessica Bowers' claims, including, but not limited to, punitive damages and all other forms of damages available to Jessica Bowers against any non-governmental entity.

### DECLARATORY JUDGMENT

193.     Plaintiff incorporates herein by reference all preceding paragraphs as if fully set forth herein verbatim.

194.     Plaintiff Jessica Bowers respectfully requests and prays that the Honorable Court enter an Order of Declaratory Judgment pursuant to the Declaratory Judgment Act, 22 U.S.C. § 2201, that the individual medical defendants do not maintain medical professional liability insurance in the aggregate amount of at least $ 1 million dollars for each occurrence covering the medical injury as required by under West Virginia Code § 55-7B-8(d).

195.     PrimeCare is the named insured of its Policy through CBC Partnership, Policy No. HC2200124 effective from March 16, 2022 to March 16, 2023. The Limits of Liability are $1,000,000 each claim per location or provider. The aggregate limits of liability per location or provider is $3,000,000. SEE attached as **Exhibit 12.**

196.     PrimeCare Defendants name fourteen PrimeCare employees associated with Defendants in their Initial Disclosures pursuant to Rule 26(a)(1) of the *Federal Rules of Civil Procedure*.

197.     As of March 29, 2022, Defendant Ashley Fisher did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

198.     As of March 29, 2022, Defendant Lisa Beard did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

199.     As of March 29, 2022, Defendant Kelsey Shank did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

200.     As of March 29, 2022, Defendant Christin Bell did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

201.    As of March 29, 2022, Defendant Brenda Engle did not maintain  professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

202.    As of March 29, 2022, Defendant Christina Way did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

203.    As of March 29, 2022, Defendant Chelsea McCrork did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

204.    As of March 29, 2022, Defendant Morticia Marshall did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

205.    As of March 29, 2022, Defendant Brandy Scott did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

206.    As of March 29, 2022, Defendant Jeanette Sweitzer did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

207.    As of March 29, 2022, Defendant Alfred Baldera did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

208.    As of March 29, 2022, Defendant PrimeCare Medical Inc. did not maintain professional liability insurance covering the medical injury which is the subject of this action in the aggregate amount of at least $1 million for each occurrence.

209.    As of March 29, 2022, Defendant PrimeCare Medical of West Virginia, Inc.

did not maintain professional liability insurance covering the medical injury which is the subject

of this action in the aggregate amount of at least $1 million for each occurrence.

210.    Plaintiff requests the Court declare that the limitations on noneconomic

damages contained in West Virginia § 55-7B-8(a)-(c) and (e), are not available to PrimeCare

Defendants which do not have medical professional liability insurance in the aggregate amount of

at least $1 million for each occurrence covering the medical injury.

## PRAYER FOR RELIEF

WHEREFORE, your Plaintiff, Jessica Bowers, prays for the following relief:

a) Damages, as set forth in this Amended Complaint, and all those allowed by law, including, but not limited to: compensatory damages in a sum consistent with the injuries to Jessica Bowers; medical bills, lost wages, pain and suffering, loss of enjoyment of life, emotional distress, economic damages, pre and post judgment interest, punitive damages (as allowed by law and against such parties as those are allowed by law), and all other recoverable damages, in an amount to be determined by the jury;

b) Judgment for damages against PrimeCare Defendants on the theory of vicarious and strict liability for the actions of their employees, agents, and representatives that proximately caused or contributed to the injuries of Jessica Bowers;

c) Jessica Bowers also seeks judgment in a punitive amount, against only the nongovernmental defendants, which will deter the defendant(s) from again engaging in such wanton, reckless, and intentional and/or negligent actions against similarly situated individuals, and against governmental defendants to the extent that immunity has been waived or deemed as a matter of law not to apply;

d) Jessica Bowers also seeks declaratory judgment that under West Virginia Code § 55-7B-8(d), the individual medical defendants do not maintain medical professional liability insurance in the aggregate amount of at least $1 million dollars for each occurrence covering the medical injury;

e) Attorney fees and costs; and such further recovery and relief as this court may deem just and equitable;

f)      With respect to John/Jane Doe Defendants, Jessica Bowers specifically seeks recovery only up to the limits of applicable insurance policies.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

                              /s/Christopher J. Heavens
                              Of Counsel for Plaintiff

**HEAVENS LAW FIRM, PLLC**
Christopher J. Heavens (WV Bar No. 5776)
2438 Kanawha Boulevard, East
Charleston, West Virginia 25311
Phone:       304-346-0464
Fax:         304-345-5775
e-mail:      chris@heavenslawfirm.com

**STEPHEN NEW & ASSOCIATES**
Stephen P. New (WV Bar No. 7756)
430 Harper Park Drive
Beckley, West Virginia 25801
Phone:       304-250-6017
Fax:         304-250-6012
e-mail:      steve@newlawoffice.com

## CERTIFICATE OF SERVICE

I, Stephen New, hereby certify that, on the 25th day of June 2024, I electronically filed the foregoing **AMENDED COMPLAINT** with the Clerk of the Court using the electronic filing system, which will send notification of such filing to all counsel of record.

/s/Christopher J. Heavens<br>
Of Counsel for Plaintiff

Christopher J. Heavens (WV Bar No. 5776)
**HEAVENS LAW FIRM, PLLC**
2438 Kanawha Boulevard East
Charleston, West Virginia 25311
Phone:        304-346-0464
Fax:          304-345-5775
e-mail:       chris@heavenslawfirm.com

**STEPHEN NEW & ASSOCIATES**
Stephen P. New (WV Bar No. 7756)
430 Harper Park Drive
Beckley, West Virginia 25801
Phone:        304-250-6017
Fax:          304-250-6012
e-mail:       steve@newlawoffice.com